UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MAYUMI DONALDSON, individually
and as Successor in Interest to
NICHOLAS DONALDSON, deceased,

                                    Plaintiff,

v.

UNITED STATES OF AMERICA,

                                    Defendant.

Case No.: 15-CV-908 JLS (KSC)

**STATEMENT OF DECISION**

    The above-captioned case came before the Court for trial without a jury on October 16 and 17, 2017.  Attorneys Brian T. Dunn and Megan R. Gyongyos appeared on behalf of Mayumi Donaldson, as Successor in Interest to Nicholas Donaldson, deceased, ("Plaintiff").  Attorneys Paul L. Starita and Rebecca G. Church appeared on behalf of the United States of America, ("Defendant").  The Court heard testimony from witnesses Thomas Grattan, Michael Hall, Steven C. Campman, M.D., Mayumi Donaldson, Benjerwin Manansala, Roger Clark, and Robert Fonzi.  The Court heard opening statements from counsel and admitted exhibits into evidence.  At the close of Plaintiff's case-in-chief, Defendant United States moved for a Rule 52(c) Judgment on Partial Findings.  *See* Fed. R. Civ. P. 52(c) (allowing Court to enter judgment on partial findings

1

if a party has been fully heard on an issue). In an oral ruling, the Court reserved on Defendant's motion. At the close of trial, the parties agreed to file written "final briefs" with the Court. (ECF. Nos. 61, 62.) In its final brief, Defendant renews its request that the Court grant Defendant's Rule 52(c) Motion, ("Def. Br.," ECF No. 61, at 9–10), which the Court addresses below.

This statement of decision constitutes the Court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). The findings and conclusions are based on the testimony and evidence admitted at trial and the principles of law that apply to those facts.

## FINDINGS OF FACT

### I.    Overview of Evidence

#### A.    *The Undisputed Facts*

The parties agree on the following undisputed facts. In April 2013, decedent Nicholas Donaldson, also known as Nicholas Pratl, lived with his wife, Mayumi Donaldson, on the 4800 block of Coconino Way, San Diego, California. On April 18, 2013, a felony bench warrant was issued for Nicholas Pratl and on April 23, 2013, the San Diego Police Department assigned the warrant to the United States Marshal Service. Deputy United States Marshal Michael Hall of the Pacific Southwest Regional Fugitive Task Force received the warrant. The arrest warrant was for a drug trafficking offense. Deputy Hall was aware that Mr. Donaldson had a prior criminal history, but did not have any information that Mr. Donaldson had any history of violent conduct or owned a firearm. ("Trial Transcript," ECF No. 59, at 83:3–11.)

On April 23, 2013, Deputy Hall conducted surveillance over the course of several hours on Mr. Donaldson's house and followed Mr. Donaldson when Mr. Donaldson drove around San Diego County until he lost contact with Mr. Donaldson. (*Id.* at 84:22–86:4.) On April 24, 2013, Deputy Hall returned, found Mr. Donaldson's vehicle in front of his house and placed a GPS tracker on Mr. Donaldson's vehicle, a silver Mercedes Benz Sport Utility Vehicle ("SUV"). (*Id.* at 87:2–4; 155:7.) Deputy Hall described the SUV as "a medium to large SUV, all blacked-out, tinted windows." (*Id.* at 155:11–12.) After Deputy

Hall placed the tracker on Mr. Donaldson's vehicle, Mr. Donaldson and his wife left together in Mr. Donaldson's vehicle. Mr. Donaldson returned approximately an hour later, by himself. (*Id.* at 87:15–17.) While Mr. Donaldson was away, Deputy United States Marshal Thomas Grattan arrived on the 4800 block of Coconino Way to assist Deputy Hall in affecting the arrest. (*Id.* at 87:18–22.) At the time of the incident, Deputy Grattan drove a silver Chevrolet Trailblazer LS SUV and Deputy Marshal Hall drove a Chevrolet Equinox LT SUV.

Mr. Donaldson returned in his vehicle. The deputies positively identified Mr. Donaldson and confirmed that he was alone. At this time, Mr. Donaldson parked his vehicle on the east curb of 4800 of Coconino Way. Deputies Hall and Grattan attempted to arrest Mr. Donaldson. The deputies were driving separate vehicles and decided to attempt to pin Mr. Donaldson's SUV between their two vehicles. The cars did not have police markings, but both deputies activated their emergency lights, red and blue flashing lights and strobe lights. (*Id.* at 156:23–157:6.) The deputies placed their vehicles' respective front bumpers against the front and rear bumper of the Mr. Donaldson's SUV, executing a tactic known as "vehicle pin." The object of the vehicle pin was to prevent Mr. Donaldson's vehicle from escaping so that the deputies could arrest Mr. Donaldson.

Once the deputies initiated the vehicle pin, Mr. Donaldson placed his vehicle into drive and drove his vehicle forward, hitting Deputy Hall's unmarked police vehicle. (*Id.* at 157:20–23.) He then put his vehicle in reverse and drove into Deputy Grattan's unmarked police vehicle. Mr. Donaldson continued to ram both the forward and rear police vehicles; Mr. Donaldson rammed each vehicle three times each for a total of six contacts. Deputy Hall exited his vehicle after Mr. Donaldson first rammed Deputy Hall's vehicle and repeated three times the verbal commands: "Police. Don't move. Let me see your hands." (*Id.* at 158:4–159:2.) Mr. Donaldson did not comply and continued to ram his vehicle into the deputies' vehicles. Deputy Hall fired two shots at Mr. Donaldson through the front windshield. (*Id.* at 88:18–21.) These rounds did not strike Mr. Donaldson. Deputy Hall then moved to the passenger side of Mr. Donaldson's vehicle and fired at least

three rounds at Mr. Donaldson through the passenger side window. (*Id.* at 92:22–24; 162:5–6.)

While the ramming was taking place, Deputy Grattan was not idle. When the deputies first executed the vehicle pin, but before the first contact by Mr. Donaldson, Deputy Grattan placed his vehicle in park and exited the vehicle. (*Id.* at 40:11–13.) After Mr. Donaldson began to drive back and forth into the deputies' vehicles, Deputy Grattan re-entered his vehicle within a few seconds of his initial exit. (*Id.* at 40:23–41:1; 55:17–18.) Deputy Grattan hunched down in the driver's seat so that he could see over the dashboard, held onto the steering wheel, and applied his body weight to the vehicle's brake pedal. (*Id.* at 43:1–15.) When Deputy Hall began firing his service weapon, Deputy Grattan ducked below the dashboard. (*Id.* at 44:8–12.)

Mr. Donaldson was hit by two (2) rounds fired by Deputy Hall from the passenger side, but his vehicle continued to move. Mr. Donaldson's car drove across the street, hit a parked car, and continued into the yard across the street from where the vehicle pin took place. By this time, Deputy Grattan had exited his vehicle and saw Mr. Donaldson's vehicle driving on the yard across the street from where the deputies and their vehicles were located. (*Id.* at 47:17–48:8.) Deputy Grattan fired his service weapon twice at Mr. Donaldson, but neither bullet struck Mr. Donaldson. (*Id.* at 47:4–6.) Mr. Donaldson's vehicle crashed into a house across the street from the vehicle pin, i.e., Mr. Donaldson's vehicle started on the west side of Coconino Way and came to rest after crashing into a house that was on the east side of Coconino Way.

Mr. Donaldson suffered two wounds: one bullet hit his bicep and a second bullet struck the right side of his head—the right parietal lobe. Mr. Donaldson was taken to Scripps Memorial Hospital, where he passed away from his head wound on April 25, 2013 at 6:25 a.m.

### B.    *The Disputed Facts*

Three matters are in dispute. First, whether Deputy Hall could see Deputy Grattan through Mr. Donaldson's vehicle. Deputy Hall testified that after Mr. Donaldson began

ramming his vehicle into the deputies' vehicles, Deputy Hall exited his vehicle and could not see Deputy Grattan while looking directly through Mr. Donaldson's windshield. (*Id.* at 94:15–21.) Deputy Hall also testified that he did not see Deputy Grattan get out of his vehicle or see Deputy Grattan near the front quarter panel of Mr. Donaldson's vehicle. (*Id.* at 94:22–95:2.) Plaintiff contends that, because Deputy Hall stood on a curb several inches above street level and because Deputy Grattan testified that he was looking over the dashboard of his vehicle, Deputy Hall should have been able to see Deputy Grattan through Mr. Donaldson's vehicle. At the very least, Plaintiff urges the Court to find that Deputy Hall's testimony is not credible as to this fact. ("Pl. Br.," ECF No. 62, at 27.)

Second, Plaintiff disputes whether Deputy Hall fired from a different location than what he testified at trial. (*Id.* at 37.) At trial, Deputy Hall testified that he exited his vehicle and stepped onto the curb next to his vehicle, (Trial Transcript 92:22–24), and fired two rounds through the windshield at Mr. Donaldson, (*Id.* at 88:18–21). Deputy Hall then repositioned himself so that he was facing the passenger side window. (*Id.* at 88:22–24.) At this point during the incident, Deputy Hall was standing on the west curb and fired in a generally eastern direction. (*See* Ex. 2-019 (Crime Scene Reconstruction Report).) Plaintiff's factual dispute rests entirely on the position of shell casings found on the scene after the shooting. At trial, Deputy Grattan testified that, generally, shell casings eject to the right and back of the shooter. (Trial Transcript 52:11–53:17.) Deputy Hall testified that he was familiar with those same ejection patterns of shell casings from his service weapon. (*Id.* at 139:20–140:5.) Photographs from the crime scene depict that Deputy Hall's shell casings came to rest in the middle of Coconino Way, as well as the east side of the street. (Ex. 16-198 (Crime Scene Photograph).) Deputy Hall did not have an explanation at trial why the casings would be found at those specific locations. (Trial Transcript 140:18–141:24.) Plaintiff contends, based on the location of the shell casings, that Deputy Hall was not standing on the curb, but instead standing somewhere in the street. (Pl. Br. 38.)

5

Third, Plaintiff disputes whether Mr. Donaldson was driving with as violent force and velocity as described by the deputies. Plaintiff contends that that pictures taken after the incident depict no damage to the front bumper of Deputy Grattan's vehicle. (*Id.* at 41 (citing Ex. 16-104).) Plaintiff contends that this physical evidence contradicts the Deputies' accounts about the "violence of the ramming motions of [Mr. Donaldson's vehicle] during the incident." (*Id.*) The Court resolves the disputed facts below.

### C.    *Summary of Claims*

Plaintiff offered evidence to support a negligence claim under the theory that Deputy Hall did not act with reasonable care with respect to firing his service weapon in defense of Deputy Grattan or himself. Plaintiff also offered evidence to support the claim that Deputy Hall committed a battery on Mr. Donaldson with respect to the same discharge of his service weapon at issue in the negligence claim. (*See* Pl. Br. 25–35.)

The evidence presented by Defendant was offered to support the following negligence-related claims: the United States is not liable for any discretionary action taken by the Deputy United States Marshals; it was reasonable for Deputy Hall to use deadly force in self-defense; it was reasonable for Deputy Hall to use deadly force in defense of Deputy Grattan; and it was reasonable for Deputy Grattan to fire his weapon at Mr. Donaldson in self-defense. Defendant presented the same evidence to support the claim that Deputy Hall was objectively reasonable in his use of force and, thus, not liable for battery. (*See* Def. Br. 12–14.)

## II.    **The Witnesses**

### A.    *Thomas Grattan*

Deputy United States Marshal Thomas P. Grattan was employed by the United States Marshal Service at the time of the shooting. Deputy Grattan drove the rear vehicle that pinned Mr. Donaldson's vehicle during the arrest. The Court finds Deputy Grattan to be a credible witness. His recollections were clear and consistent.

Deputy Grattan testified to the following facts at trial. At the time he arrived at the location of the shooting, Deputy Grattan was not aware of any violent criminal history

attributable to Mr. Donaldson; that Mr. Donaldson was in possession of any firearm; or that Mr. Donaldson had ever been accused of injuring any person. (Trial Transcript 33:16–25.) Deputy Grattan was aware of relevant United States Marshal Service policies, (*see, e.g.*, *id.* at 34:3), and was trained in some advanced techniques including bringing a moving vehicle to a stop without deadly force and containment techniques of a person in a moving vehicle without deadly force, (*see id.* at 36:1–10). Deputy Grattan also testified that he was trained that it is a preferred police tactic to get out of the way when confronted with an individual who resists arrest by trying to escape in a vehicle. (*Id.* at 37:20–38:1.) At the time of the incident, Deputy Grattan testified that his vehicle had red and blue lights that identified his Chevrolet Trailblazer as a police vehicle and that he was wearing his police badge around his neck. (*Id.* at 63:12–24.)

Immediately after the initial vehicle pin, Deputy Grattan exited his vehicle to approach the driver's side and arrest Mr. Donaldson. (*Id.* at 63:5–7.) Deputy Grattan saw Mr. Donaldson's wheels begin to spin and his reverse taillights come on, which caused Deputy Grattan to fear that the car was going to move. Deputy Grattan re-entered his vehicle. (*Id.* at 64:8–15.) His initial exit and re-entry into his vehicle lasted approximately one to two seconds. (*Id.* at 76:9–18.) When Mr. Donaldson began ramming his vehicle into Deputy Hall's vehicle, Deputy Grattan testified that he re-entered his Trailblazer for two purposes: first, to maintain the vehicle pin and second, to avoid being run over by Mr. Donaldson. (*Id.* at 41:22–42:3.) After he re-entered the vehicle, Deputy Grattan hunched his body down behind the steering wheel and dashboard of his vehicle, but could still see over the dashboard. (*Id.* at 43:5–15.) Once Deputy Hall fired his first round, Deputy Grattan testified that he ducked down completely behind the dashboard in order to use the engine block as a barrier, which he knew was the best option to provide cover from stray bullets. (*Id.* at 44:8–45:5.)

Deputy Grattan testified that after the shooting stopped, he exited his vehicle, saw Mr. Donaldson's vehicle in the yard across the street, believed that Mr. Donaldson was going to exit the yard, and "attempt to go through my position to make an escape." (*Id.* at

7

47:17–48:8.) Deputy Grattan testified that he believed his life was in danger, that he did not believe he had time to move to a different position that would take him out of the path of danger, and he fired two rounds at the driver's side of Mr. Donaldson's vehicle. (*Id.* at 49:7–21.) He did not strike Mr. Donaldson with either round.

### B.  *Michael Hall*

Deputy United States Marshal Michael Hall was employed by the United States Marshal Service at the time of the shooting. Deputy Hall, like Deputy Grattan, was aware of relevant United States Marshal Service policies, (*see, e.g.*, *id.* at 89:11), and training directives, (*see id.* at 90:20–25), relating to the arrest of suspects, use of deadly force, and containment of vehicles, amongst other policies. The Court finds Deputy Hall to be a credible witness. His recollections were clear and consistent. At trial, Deputy Hall testified to the following facts.

Deputy Hall received an arrest warrant for Mr. Donaldson two days prior to the shooting. (*Id.* at 82:17.) When Deputy Hall received the arrest warrant for Mr. Donaldson Deputy Hall was not aware of any violent criminal history attributable to Mr. Donaldson; that Mr. Donaldson was in possession of any firearm; or that he had ever been accused of injuring any person. (*Id.* at 83:3–11.) The day before the shooting Deputy Hall conducted several hours of visual surveillance on Mr. Donaldson's home. (*Id.* at 84:22–85:9.) When Mr. Donaldson departed for an excursion, Deputy Hall trailed Mr. Donaldson's vehicle in his unmarked police vehicle, but lost contact with Mr. Donaldson at some point in the evening. The next morning, Deputy Hall returned to Mr. Donaldson's home and placed a GPS tracker on Mr. Donaldson's vehicle, which Deputy Hall described as a medium to large, silver Mercedes SUV with "all blacked-out, tinted [rear] windows." (*Id.* at 86:5–18, 155:6–14.) Mr. Donaldson then left his home with his wife; during that time Deputy Hall made contact with Deputy Grattan to plan the arrest. (*Id.* at 87:10–25.)

Deputy Hall believed that if Mr. Donaldson returned alone it made sense to effect a vehicle pin and that due to Mr. Donaldson's apparent lack of violent history, Deputy Hall thought that two deputy marshals would be enough to affect an arrest. (*Id.* at 151:21–

152:7.) Mr. Donaldson returned, alone, in his vehicle. Deputy Hall communicated over his radio with Deputy Grattan and they initiated the vehicle pin by driving their respective vehicles up to Mr. Donaldson's vehicle. (*Id.* at 156:4–13.) Deputy Hall initiated the vehicle pin by driving his vehicle all the way to Mr. Donaldson's vehicle and made contact with his front bumper to Mr. Donaldson's front bumper; during this time, Deputy Hall's emergency lights were activated. (*Id.* at 156:16–157:6.) Additionally, Deputy Hall was wearing civilian clothes and wore his U.S. Marshal badge around his neck. (*Id.* at 169:9–12.) Deputy Hall observed Mr. Donaldson's reaction to the vehicle pin; he saw a look of confusion on Mr. Donaldson's face and then saw Mr. Donaldson's hands drop out of view. (*Id.* at 157:9–18.) At first, Deputy Hall believed that Mr. Donaldson might have been reaching for a firearm, but then realized that Mr. Donaldson put his vehicle into drive. (*Id.* at 157:19–24.) Mr. Donaldson drove his vehicle into Deputy Hall's vehicle.

Deputy Hall estimated that only a few seconds elapsed from when he was first struck by Mr. Donaldson's vehicle to when he exited his vehicle. (*Id.* at 91:19–92:6.) Once Mr. Donaldson's vehicle began to ram the deputies' vehicles, Deputy Hall believed that Mr. Donaldson was not going to be compliant. (*Id.* at 158:1.) Deputy Hall exited onto the curb, which was several inches above street level, and stood next to the front quarter panel of his vehicle. (*Id.* at 93:2–8.) Deputy Hall testified that he looked at Deputy Grattan's Trailblazer through Mr. Donaldson's vehicle but did not see Deputy Grattan. Specifically Deputy Hall said that Deputy Grattan did not "appear where I thought he should appear." (*Id.* at 94:15–95:2; 159:7–8.) Deputy Hall estimated that approximately five to ten seconds elapsed from the time when Deputy Hall looked at Deputy Grattan's vehicle until the time Deputy Hall decided to open fire on Mr. Donaldson. (*Id.* at 95:3–9.) Deputy Hall testified that he was concerned for the life of Deputy Grattan. (*Id.* at 120:1–4; 121:13 ("I fired in defense of my partner.").) Deputy Hall believed that the "only possible place for him to be would be in that small window behind the Mercedes that I couldn't see." (*Id.* at 159:15–16.) That is, Deputy Hall believed Deputy Grattan's body was pinned in between Mr. Donaldson's rear bumper and Deputy Grattan's own front bumper. Deputy Hall also

testified that he could not see through Mr. Donaldson's vehicle "mostly" because of the tinted windows. (*Id.* at 159:18–19.)

Deputy Hall issued verbal commands to Mr. Donaldson—"Police. Don't move. Let me see your hands"—repeating those commands three times. (*Id.* at 159:1–2.) He did not draw his weapon until he completed issuing those commands to Mr. Donaldson to stop what he was doing. (*Id.* at 159:24–160:4.) Deputy Hall observed that the vehicle was still moving "violently back and forth" and he believed that Mr. Donaldson "was using his [vehicle as a] weapon to allow him to smash out of the pin." (*Id.* at 161:7–9.) At this time, Deputy Hall made the decision to fire at Mr. Donaldson. (*Id.* at 161:14.) Deputy Hall analogized that if he were to quantify his decision to fire he estimated eighty percent (80%) of his motivation was to protect the life of Deputy Grattan and twenty percent (20%) was to protect his own life. (*Id.* at 121:21.)

Deputy Hall fired two rounds through the windshield at Mr. Donaldson. (*Id.* at 125:25–126:5.) He observed that these two rounds did not affect Mr. Donaldson's behavior and decided to move and shoot from different location. (*Id.* at 161:22–162:1.) Deputy Hall then repositioned himself forward of his original firing position, while still on the curb, so that he was looking into the passenger side window of Mr. Donaldson's vehicle. (*Id.* at 127:2–5.) Deputy Hall testified that he fired three rounds through the passenger side window and he believed he struck Mr. Donaldson with his fourth and fifth rounds.[1] (*Id.* at 126:6–15.) Deputy Hall asserted that he did not fire at Mr. Donaldson to prevent him to escape, but because he was using his vehicle as a weapon and could have killed either deputy. (*Id.* at 164:17–25.) When Deputy Hall engaged Mr. Donaldson, he did not look to see where Deputy Grattan was located. (*Id.* at 127:2–9.) Deputy Hall stated that he did

---

[1] The Court notes that the Crime Scene Reconstruction Report concludes that Deputy Hall fired six shots, not five. (Ex. 2-024.) This conclusion is drawn from the magazine capacity of Deputy Hall's service weapon examined after the incident. However, the Court finds that accounting for the sixth round is not critical in the negligence or battery analysis because the parties do not contest that two of Deputy Hall's rounds struck Mr. Donaldson. The only dispute is whether Deputy Hall's actions were objectively reasonable.

15-CV-908 JLS (KSC)

not believe he had time to check if Deputy Grattan was trapped between Mr. Donaldson's vehicle and Deputy Grattan's own vehicle. (*Id.* at 128:3–8.)

Deputy Hall testified that when he ceased firing Mr. Donaldson's vehicle was driving away from Deputy Hall. (*Id.* at 134:7.) Deputy Hall generally agreed with the statement that at the time Mr. Donaldson's vehicle was driving away from his position, Deputy Hall no longer perceived a danger to himself or Deputy Grattan. (*Id.* at 134: 7–12.) Then, Deputy Hall noticed that his own vehicle was moving backwards, and he ran after it so that the vehicle would not hit anything. Around that time, he heard Deputy Grattan fire his weapon. (*Id.* at 163:25–164:7.)

Deputy Hall was asked about the positioning of his shell casings, found after the shooting incident. The shell casings were found generally in the middle and east side of Coconino Way, (*see* Ex. 16-198). When asked whether he had an explanation as to why the shell casings were found in the middle of the street, Deputy Hall did not have an explanation. (Trial Transcript 141:10–24.) However, when asked whether it was possible that he was standing in the middle of the street—rather than on the curb—Deputy Hall testified that it was "not possible" he was anywhere other than the curb. (*Id.* at 141:25–142:4.)

### C.    *Steven C. Campman, M.D.*

Dr. Steven Campman is a Deputy Medical Examiner in the San Diego County Medical Examiner's Office. Dr. Campman performed the autopsy on Mr. Donaldson and authored the autopsy report. (Exs. 30, 31.) The Court finds Dr. Campman credible.

Dr. Campman testified that Mr. Donaldson received two gunshot wounds on April 24, 2013: one bullet entered the right triceps area and exited the right biceps area; the other bullet entered the right parietal scalp (right side of head) and did not exit. (Trial Transcript 104:2–9.) Dr. Campman determined that the path of the bullet that struck Mr. Donaldson's right parietal lobe traveled from the right side of his body to the left. (*Id.* at 106:21–22.) The bullet that struck Mr. Donaldson's arm also traveled slightly forward, slightly upward, and leftward. (*Id.* at 109:13–14.) Dr. Campman determined the gunshot wound to the head

was the cause of death.  (*Id.* at 113:25–114:16.)  Dr. Campman was unable to determine which of the two gunshot wounds Mr. Donaldson sustained first.  (*Id.* at 112:11–14.)

### D.  *Mayumi Donaldson*

Ms. Donaldson was married to the decedent Mr. Nicholas Donaldson.  Ms. Donaldson met Mr. Donaldson in October or November of 2005, (*id.* at 173:8), and they were married in November 2009, (*id.* at 174:12).  The Court finds Ms. Donaldson credible.

Ms. Donaldson testified that she lived with Mr. Donaldson and Mr. Donaldson's parents at the time of the shooting.  Ms. Donaldson testified as to the activities she shared with the decedent when they were married.  (*See, e.g.*, *id.* at 176.)

### E.  *Benjerwin Manansala*

Lieutenant Manansala was, at the time of the shooting, a Patrol Sergeant in the San Diego Police Department.  Lieutenant Manansala testified that he took a Public Safety Statement[2] from Deputies Hall and Grattan and that the Public Safety Statement, (Ex. 29), was an accurate—though not verbatim—summary of what he heard from the deputies, (Trial Transcript 187:1–20; 188:12–15).  The Court finds Lieutenant Manansala credible.

### F.  *Roger A. Clark*

Mr. Roger Clark is a retired Lieutenant and held several positions in the Los Angeles County Sheriff's Department during his career from 1965 until 1993.  Mr. Clark currently works as a police procedures consultant and testified on behalf of Plaintiff as a use of police force expert.  The Court finds Mr. Clark to be credible though that finding is qualified by the following: Mr. Clark retired from the Los Angeles County Sheriff's Department in 1993, (*id.* at 216:5–8), and has not attended any continuing education or training on the legal standards, techniques, or methods with regard to the reasonable use of force since his retirement, (*id.* at 216:24–217:3.)  Thus, Mr. Clark's opinions reflect police use of force

---

[2] Lieutenant Manansala explained that a Public Safety Statement is generally intended to ensure there are no outstanding suspects who could pose a threat to the public and to account for the rounds fired by a law enforcement officer.  (Trial Transcript 185:5–13.)

standards and tactics as they were several decades ago and were not as persuasive as opinions formed based on more modern standards and techniques.

Mr. Clark testified that generally law enforcement officers are trained to "step out of the way" when confronted with a threat from a moving motor vehicle because a bullet is "never going to stop the momentum" of that vehicle. (*Id.* at 195:9–16.) Mr. Clark addressed the situation of "crossfire," generally defined as firing a weapon when the bullet would travel towards a fellow law enforcement officer or a bystander—that is, anyone other than the intended target. He testified that officers "will never shoot in the direction of [a] partner or an innocent civilian." (*Id.* at 197:2–3.) Mr. Clark drew this opinion from historical examples when fellow law enforcement personnel or civilians were hit by bullets intended for the target. (*Id.* at 197:5–9.)

Mr. Clark reviewed the deputies' testimony regarding their justifications for the use of deadly force. He opined that Deputy Hall's use of force was not objectively reasonable. Specifically, Mr. Clark testified that Deputy Hall did not see his partner and that Deputy Hall should have looked and seen his partner before using deadly force. (*Id.* at 206:22–207:14.) Mr. Clark stated that Deputy Hall could have looked because the two vehicles were only a few inches apart. (*Id.* at 209:2–14.) He also opined that even if, hypothetically, the vehicle had tinted windows preventing someone from seeing through the vehicle, then Deputy Hall should have repositioned himself to see that no one was between the two vehicles. (*Id.* at 209:15–22.) Mr. Clark also testified that, based on the record, Deputy Hall's actions were unreasonable because Deputy Hall fired in the direction of his partner and missed him by a few feet. (*Id.* at 210:9–11.) He stated that officers are not trained to fire in the direction of their partners. (*Id.* at 210:13–17.)

On cross examination, Mr. Clark testified that Mr. Donaldson's actions did not constitute a crime such as assault with a deadly weapon, but rather characterized Mr. Donaldson's actions as property damage. (*Id.* at 222:8–14.) Mr. Clark agreed that Mr. Donaldson's actions could constitute assault with a deadly weapon if someone was in the vehicle's path, but opined that, based on his review of the facts of this case, the deputies

were not in close enough proximity to constitute assault with a deadly weapon. (*Id.* at 222:25–224:2.) Mr. Clark also opined that Mr. Donaldson's vehicle was not a threat to Deputy Hall, at the time Deputy Hall fired upon Mr. Donaldson, because the vehicle was turning away from Deputy Hall in an attempt to flee, not an attempt to assault. (*Id.* at 228:21–229:4.) He also testified that Deputy Grattan did not face an imminent threat of death or serious bodily injury because Deputy Grattan was in his vehicle. (*Id.* at 229:5–10.)

### G. *Robert Fonzi*

Mr. Robert Fonzi retired in January 2014 as the Undersheriff of San Bernardino County and held several positions in the Sheriff's Office and other police departments before reaching the Undersheriff position. Mr. Fonzi began in 1981 and his career spanned thirty-three years. Mr. Fonzi currently works as a police consultant and testified on behalf of the Defendant as a police use of force expert. The Court finds Mr. Fonzi to be very credible and his opinions include the most recently developed use of force techniques used by modern law enforcement personnel. Mr. Fonzi's training and roles within various police departments were directly relevant to police use of force situations, like the incident here.

Mr. Fonzi testified to the following at trial. First, he testified that it was not reasonable for Deputy Hall to verify Deputy Grattan's location before engaging Mr. Donaldson with his service weapon. Mr. Fonzi said that the 1999 Columbine, Colorado school shooting changed the way in which law enforcement personnel respond to threats. Police officers are now trained not to "run away and hide behind a car," but rather to "get out in front" of the threat, even if there is only one officer on the scene. (*Id.* at 261:22–262:2.) Further, Mr. Fonzi stated that there is no training or guideline requirement that mandates an officer verify the location of his or her partner before using deadly force. (*Id.* at 266:12–18.) If Deputy Hall reasonably feared for his partner's life, then Mr. Fonzi opined that it would not be reasonable to verify the location of Deputy Grattan. (*Id.* at 266:19–22.)

Mr. Fonzi next discussed whether it was permissible to ever shoot at a moving vehicle. Mr. Fonzi opined that he was not aware of any training that prohibited all instances of shooting at a moving vehicle; instead, officers are taught to take into consideration their training when deciding whether to fire at a moving vehicle. (*Id.* at 267:25–268:12.) He also opined that Mr. Donaldson's use of a vehicle would be characterized as a deadly weapon. (*Id.* at 270:14–16.)

Mr. Fonzi then testified how the concept of crossfire would affect the decision making of the deputies. He opined that law enforcement officers are trained to consider risks of crossfire in determining whether to use deadly force, but are not precluded from firing their weapon simply because the risk of crossfire exists. (*Id.* at 271:15–272:7.) Police officers consider the potential for crossfire, in a split-second process, along with all other considerations. (*Id.*) Mr. Fonzi agreed that Deputy Hall's bullets were directed generally where, according to Mr. Fonzi's review of the facts, Deputy Hall believed Deputy Grattan to be located, i.e., Deputy Hall's bullets could have passed through Mr. Donaldson's vehicle to the rear bumper of the vehicle where Deputy Hall thought Deputy Grattan was pinned. (*Id.* at 298:20–23.) He qualified his views by stating that crossfire is a consideration when training officers, but it does not cause paralysis or prohibit an officer from engaging a suspect. (*Id.* at 299:2–6.)

Mr. Fonzi agreed that deadly force was a last resort to be used only when other means of control are unreasonable or would be ineffective. (*Id.* at 278:5–9.) He went on to state that the use of deadly force as a last resort takes into account the dynamics of a situation. (*Id.* at 278:23–279:9.) Mr. Fonzi opined that if he were in Deputy Hall's position, given the facts of the case, he would have believed that his partner was in danger of being killed or injured and that Deputy Hall's decision to use deadly force was objectively reasonable. (*Id.* at 269:3–25.)

/ / /

/ / /

/ / /

## III.    Findings of Fact

Based on the foregoing discussion of testimony and exhibits presented at trial, as well as the credibility determinations of the witnesses, the Court makes the following findings.

### A.    Whether Deputy Hall Could See Deputy Grattan Before Engaging Mr. Donaldson

The Court finds Deputy Hall's testimony credible when he said that he could not see Deputy Grattan through Mr. Donaldson's vehicle.  Deputy Hall testified that after Mr. Donaldson began ramming his vehicle into the Deputies' vehicles, Deputy Hall exited his vehicle and could not see Deputy Grattan while looking directly through Mr. Donaldson's windshield.  (*Id.* at 94:15–21.)  Deputy Hall also testified that he did not see Deputy Grattan get out of his vehicle or see Deputy Grattan near the front quarter panel of Mr. Donaldson's vehicle.  (*Id.* at 94:22–95:2.)  Mr. Donaldson's vehicle was a "medium to large" SUV with tinted windows.  Of note, the rear windows were intact throughout the incident, which means that Deputy Hall would have had to see through the rear tinted windows to see Deputy Grattan hunched down in his vehicle.

Plaintiff contends that, because Deputy Hall stood on a curb several inches above street level and Deputy Grattan testified that he was looking over the dashboard of his vehicle, Deputy Hall should have been able to see Deputy Grattan through Mr. Donaldson's vehicle.  That is, when Deputy Hall looked for Deputy Grattan, Deputy Grattan's head would have been above the dashboard.  Alternatively, Plaintiff argues Deputy Hall's testimony is not credible as to this fact.  (Pl. Br. 27.)

The Court begins by noting that the animated forensic reconstruction of the incident generally illustrates that that at about the same time that Deputy Hall was exiting his vehicle, Deputy Grattan was re-entering his vehicle.  (*See* Exs. 11–13.)  When Deputy Grattan re-entered his vehicle he positioned himself so that he could see over the dashboard but was not sitting fully upright.  It is in this window of time, i.e., the seconds following Mr. Donaldson's initial contact, that Deputy Hall looked for Deputy Grattan but testified

that he could not see Deputy Grattan. Three considerations weigh against Plaintiff's theory. First, the reconstruction of the timing is based on the deputies' recollections after a violent, dynamic incident. Therefore, the exact, second-by-second timing will necessarily be fraught with imprecision. This includes the forensic animation, reconstructed from the deputies' own recollections.

Second, Plaintiff does not address the objective fact that in the window of time in which Deputy Hall had to look for Deputy Grattan, Deputy Hall would have had to see through the following objects: (1) Mr. Donaldson's windshield, (2) around Mr. Donaldson's body or the other apparatus in the vehicle,[3] (3) through the blacked-out, tinted rear windows, and (4) Deputy Grattan's windshield. Through all these barriers, Plaintiff's theory requires Deputy Hall to have seen whatever portion of Deputy Grattan's head remained above the dashboard. Indeed, Deputy Grattan was not sitting upright in his vehicle. The Court agrees with Plaintiff that Deputy Hall's vantage point was several inches higher relative to street level because he was standing on the curb. However, the increase in elevation does not explain how Deputy Hall could see through Mr. Donaldson's vehicle, especially given Mr. Donaldson's tinted rear windows.

Third, the situation Deputy Hall found himself in was not static; Mr. Donaldson continued to ram his car back and forth in the brief seconds Deputy Hall looked for his partner. Thus, Deputy Hall would have had to see his partner while also avoiding the movement of Mr. Donaldson's vehicle and continuing to assess the threat level presented. Given the totality of these objective factors, the Court finds credible Deputy Hall's testimony that he could not see Deputy Grattan.

### B.    *Whether Deputy Hall Fired from a Location Other than the Curb*

The Court finds that Deputy Hall fired his weapon from the curb next to his vehicle. At trial, Deputy Hall testified that he stepped from his vehicle onto the curb,[4] (Trial

---

[3] These impediments include the rearview mirror and the roof of the car. (*See* Exs. 18-008, 18-009.)
[4] The "curb" means the general area between the sidewalk and the actual concrete curb abutting the street. (*See* Exs. 14-016, 14-019.)

15-CV-908 JLS (KSC)

Transcript 92:22–24), and fired two rounds through the windshield at Mr. Donaldson, (*Id.* at 88:18–21). Deputy Hall then repositioned himself so that he was facing the passenger side window. (*Id.* at 88:22–24.) At this point, Deputy Hall was standing on the west curb and fired in a generally eastern direction. (*See* Ex. 2-019 (Crime Scene Reconstruction Report).) Deputy Hall testified that he was familiar with the ejection pattern of shell casings from his service weapon. (Trial Transcript 139:20–140:5.) Generally, shell casings eject to the right and rear of the shooter. (*Id.* at 52:11–53:17.) Crime scene photographs depict Deputy Hall's shell casings found in the middle of the Coconino Way, as well as the east side of the street. (Ex. 16-198 (Crime Scene Photograph).) This could suggest the shell casings were not where one might expect given the typical ejection trajectory.[5] Deputy Hall did not have an explanation at trial why the casings would be found there rather than a location consistent with the ejection pattern of the pistol. (Trial Transcript 140:18–141:24.) Plaintiff contends, based on the location of the shell casings alone, that Deputy Hall was not standing on the curb, but instead standing somewhere in the street. (Pl. Br. 38.) If true, Deputy Hall could see that Deputy Grattan was safely inside his vehicle. (*Id.*)

Plaintiff has no other evidence to support her contention besides the location of the shell casings. Plaintiff's theory is unsupported by the objective facts. Mr. Donaldson's autopsy revealed that the direction of travel of the bullets that struck him were from right to left. He was struck in the right parietal lobe and the right arm. The direction of travel and wounds are consistent with Deputy Hall's testimony that his second volley of bullets originated from the curb to Mr. Donaldson's right. Mr. Donaldson sat in the driver's seat with his vehicle oriented towards Deputy Hall's vehicle; thus, Mr. Donaldson's right side faced the passenger side window—the direction Deputy Hall represents he fired from.

---

[5] If Deputy Hall stood on the west curb of Coconino Way, facing east and firing east, then the expected casing trajectory would be south (to the right of Deputy Hall) and west (to the rear of Deputy Hall).

15-CV-908 JLS (KSC)

Thus, the autopsy is consistent with Deputy Hall's testimony that he fired from the curb, through the passenger window, and struck Mr. Donaldson's right side.

Several other exhibits contradict Plaintiff's theory. For example, Exhibit 1 illustrates the location of five discrete bullet strike marks. Those strike marks are located generally on the east side of Coconino Way. This supports Deputy Hall's testimony that he was shooting from west to east on the curb by Mr. Donaldson's front and passenger side windows. The Crime Scene Reconstruction Report describes the bullet strike marks on the exterior wall of 4825 Coconino Way were all caused by the same bullet, which traveled in a west to east direction. (Ex. 2-022.) Further, the Crime Scene Reconstruction Report describes bullet strike marks located on the interior of the driver's door window in the window gasket and also noted that there were no bullet strike marks on the exterior of the driver's side door. The report described this as consistent with a bullet "travelling from the passenger side to the driver side of the vehicle." (Ex. 2-023.) The physical evidence from the bullet strike marks is consistent with Deputy Hall's testimony that he fired from the west curb in a northeasterly direction (through the windshield) and then an easterly direction (through the passenger window). Thus, the Court finds Deputy Hall's testimony credible.

### C.     Whether Mr. Donaldson's Vehicle Was a Deadly Weapon

The Court finds that there is sufficient evidence to support the deputies' testimony that Mr. Donaldson's vehicle was moving with violent—and potentially deadly—velocity and force. Plaintiff proposes that the lack of damage to Deputy Grattan's front bumper casts doubt on the deputies' testimony. It is true that there was minor superficial damage to the rear of Mr. Donaldson's vehicle and apparently no visible damage to the front of Deputy Grattan's vehicle. The Crime Scene Construction Report described the damage to Mr. Donaldson's vehicle as the "left side of the rear bumper shows minor damage, including paint fracture and black transfer material. The shape of the damage pattern is similar in appearance to a license plate frame." (Ex. 2-023.) The Report also described Deputy Grattan's Trailblazer as having "[n]o obvious damage." (Ex. 2-020.) The Report's

statements are inconclusive to the factual issue. At most, the Court infers that Deputy Grattan's license plate and license plate holder struck Mr. Donaldson's vehicle with enough force to leave its mark on Mr. Donaldson's vehicle.

There are additional objective facts that shed light on the force and velocity issue. First, Mr. Donaldson's vehicle eventually broke out of the vehicle pin, drove perpendicularly across Coconino Way, and hit a parked Mitsubishi Lancer on the other side of the street. Mr. Donaldson's vehicle hit the Lancer with such force that it knocked the car ninety degrees from its starting position and the car had "significant impact damage." (*Id.*) Second, Deputy Hall's Chevrolet Equinox had apparent paint transfer, damage to the front bumper, and the license plate knocked off the vehicle. (*Id.*) Deputy Hall's vehicle was hit with enough force to roll backwards from its original position and cause Deputy Hall to chase after his vehicle. Both these objective facts suggest Mr. Donaldson's vehicle impacted Deputy Hall's vehicle and the Lancer with significant force. Thus, any doubt injected by the lack of damage to Deputy Grattan's vehicle is resolved by the broader objective facts. These facts are consistent with the deputies' testimony. The Court finds the deputies' testimony credible that Mr. Donaldson's vehicle was moving at sufficient speed and velocity to pose a threat to a human in the vicinity of the vehicle.

## CONCLUSIONS OF LAW

### I.    Legal Standard

####    *A.    Federal Tort Claims Act*

"An action can be brought by a party against the United States only to the extent that the Federal Government waives its sovereign immunity." *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir. 1996) (citation omitted). The Federal Tort Claims Act ("FTCA") is a limited waiver of sovereign immunity that allows plaintiffs to seek damages against the United States for certain torts committed by federal employees. 28 U.S.C. §§ 1346(b), 2674. "Substantively, the FTCA makes the United States liable 'to the same extent as a private individual in like circumstances,' under the law of the place where the tort occurred,

subject to enumerated exceptions to the immunity waiver." *Levin v. United States*, 568 U.S. 503, 506–07 (2013) (citing 28 U.S.C. §§ 2674, 2680(a)–(n), 1346(b)(1)).

Here, Plaintiff brings one cause of action for negligence and one cause of action for battery, the latter of which directly implicates the "law enforcement proviso" of the FTCA. One exception to the waiver of sovereign immunity prohibits suits against the United States arising out of intentional torts, including battery. *See* § 2680(h). However, the "law enforcement proviso" within section 2680(h) "extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the acts or omissions of investigative or law enforcement officers." *Millbrook v. United States*, 569 U.S. 50, 52–53 (2013) (citing § 2680(h)). Because Deputy Hall is a law enforcement officer, Plaintiff may bring her intentional tort claim under the FTCA.

Also relevant in this case, the discretionary function exception to the FTCA provides:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). If the discretionary function exception applies, then then United States retains its sovereign immunity and the district court lacks subject matter jurisdiction over the discretionary conduct. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002).

Courts apply a two-part test to determine whether the exception applies. First, a court examines whether the challenged conduct is discretionary—that is, whether it involved "an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Judgment or choice is absent "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* Second, if the conduct involves judgment or choice, the court must "determine whether that judgment is

15-CV-908 JLS (KSC)

of the kind that the discretionary function exception was designed to shield." *Id.* "The primary focus of the second part of the test is on 'the nature of the actions taken and on whether they are susceptible to policy analysis,'" *Fang v. United States*, 140 F.3d 1238, 1241 (9th Cir. 1998) (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)), and "involve a 'decision [] grounded in social, economic, and political policy.'" *O'Toole v. United States*, 295 F.3d 1029, 1034 (9th Cir. 2002) (alteration in original) (quoting *Gaubert*, 499 U.S. at 323).

In *Estate of Salazar v. United States*, No. LA CV11-10279 JAK (SPx), 2014 WL 12588477, at *18–23 (C.D. Cal. May 20, 2014), the district court examined the discretionary function exception in a situation with facts similar to the case at bar. There, two deputy United States marshals attempted to arrest a fugitive. The suspect was in his vehicle, did not comply with the deputies' commands, and the deputies saw the suspect holding a handgun. *Id.* at *3. The deputies believed that the suspect posed an imminent threat to their safety, they ordered the suspect to drop the gun, and then discharged their weapons killing the suspect. *See id.* The court found that the only two non-discretionary actions during the shooting incident were (1) a policy directive for deputy marshals to identify themselves in the course of an arrest and (2) to be reasonable in the use of deadly force. All other decisions—including how to conduct surveillance, how to make an arrest, and how to identify themselves—were discretionary. *See id.* at *18–19.

The Court finds the *Salazar* court's analysis of the discretionary function exception, as applied to the United States Marshal Service's policies, is an accurate analysis of the law and adopts the reasoning as to the discretionary function exception. Here, Plaintiff does not contest that Deputies Hall and Grattan wore their deputy marshal badges identifying them as law enforcement officers. Moreover, Plaintiff's analysis focuses on the reasonableness during the use of force and not the pre-shooting conduct and does not identify any other non-discretionary policy that might apply. Therefore, the Court will analyze Deputy Hall's conduct during the shooting incident, but not the deputies' pre-

shooting conduct, which is normally relevant under California state law, *see infra* Conclusions of Law section I.B.

## B. Negligence

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (alteration in original) (quoting *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 292 (1988)). The California Supreme Court has held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect," and that "police officers have a duty to use reasonable care in employing deadly force." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013) (quoting *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979)); *see also Hayes*, 57 Cal. 4th 622 (responding to certified question from Ninth Circuit concerning reasonableness inquiry). "The reasonableness of an officer's conduct is determined in light of the totality of the circumstances." *Hayes*, 57 Cal. 4th at 629 (citations omitted). Claims of excessive force under California law are analyzed under the same objective reasonableness standard used in Fourth Amendment claims. *Hayes*, 736 F.3d at 1232 (citing *In re Joseph F.*, 85 Cal. App. 4th 975, 989 (2000)); *see also Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 n.11 (Ct. App. 2009) ("Because federal civil rights claims of excessive use of force are the federal counterpart to state battery and wrongful death claims, federal cases are instructive in this area.").

Objective reasonableness in Fourth Amendment claims requires that the "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). To do so, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* In the Ninth Circuit, district courts also consider,

"under the totality of the circumstances, the 'quantum of force' used, the availability of less severe alternatives, and the suspect's mental and emotional state." *Hayes*, 736 F.3d at 1232 (quoting *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007); and citing *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001)). The "most important" factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Further, "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability." *Hayes*, 57 Cal. 4th at 639. Finally, all determinations of unreasonable force, "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

### C. Battery

Battery is defined by the California Penal Code: "A battery is any willful and unlawful use of force or violence upon the person of another." Cal. Penal Code § 240. The elements of a battery claim are: (1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plaintiff's person, (2) the plaintiff did not consent to the contact, and (3) the contact caused injury, damage, loss, or harm to the plaintiff. *Tekle v. United States*, 511 F.3d 839, 855 (9th Cir. 2007) (citing *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005)).

A police officer in California may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance. Cal. Penal Code § 835a. "[A] prima facie battery is not established unless and until plaintiff proves unreasonable force was used." *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (Cal. Ct. App. 1998). "[T]he defendant police officer is in the exercise of the privilege of protecting the public peace and order [and] he is entitled to the even greater use of force

than might be in the same circumstances for self-defense. [T]he burden of proof [is] upon the plaintiff to establish the use of excessive force." *Id.* (quoting *Wirsing v. Krzeminski*, 213 N.W.2d 37, 41 (Wis. 1974)); *see also* CACI 1305 Battery by Peace Officer.

As with negligence, claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims. *Hayes*, 736 F.3d at 1232. Thus, the unreasonable force requirements from *Graham v. Connor* apply to Plaintiff's battery claim and Plaintiff has the burden of proof to establish the use of excessive force. *See Edson*, 63 Cal. App. 4th at 1273 (citing *Graham*, 490 U.S. at 396–97); *see also Champommier v. United States*, Nos. CV11–10538–MWF (PJWx), CV11–3913, 2013 WL 4502069, at *18 (C.D. Cal. Aug. 21, 2013) ("Reasonableness of a use of force by a police officer under California battery law is measured in part by referencing the Constitution and its protections, as elucidated in *Graham v. Connor*.").

## II. Analysis

The Court first discusses Defendant's motion under Rule 52(c) to enter judgment in its favor based only on Plaintiff's case-in-chief. Under Rule 52(c), "the court may enter judgment as a matter of law . . . with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006) (quoting Fed. R. Civ. P. 52(c)). At trial, the Court reserved on Defendant's Rule 52(c) motion until the close of evidence so that the Court could hear from Defendant's expert on police use of force. Defendant renews the motion in its closing brief. (Def. Br. 9.)

The Court has had the benefit of hearing from all witnesses, including both sides' experts. Regardless of the Rule 52(c) motion, the Court must weigh the evidence, resolve any conflicts in the evidence, and make findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a). Further, the same standard of review would apply on appeal between a judgment following a bench trial or a Rule 52(c) motion. *See Lee v. W. Coast Life Ins. Co.*, 688 F.3d 1004, 1009 (9th Cir. 2012) (citing *Price v. U.S. Navy*, 39 F.3d 1101, 1021 (9th Cir. 1994)). If the Court granted Defendant's Rule 52(c) motion it would make findings

of fact and conclusions of law based on Plaintiff's case-in-chief. Yet, the Court requires Defendant's expert witness to interpret the findings of fact. Therefore, the Court **DENIES** Defendant's Rule 52(c) Motion. The Court turns to the merits of Plaintiff's claims.

Plaintiff only pursues negligence and battery claims against Deputy Hall's conduct because, as Plaintiff concedes, neither of Deputy Grattan's rounds struck Mr. Donaldson. (Pl. Br. 24 n.2.) While California law allows consideration of an officer's pre-shooting conduct, the discretionary function exception to the FTCA limits this Court's jurisdiction to consider any discretionary pre-shooting conduct. Furthermore, Plaintiff does not argue that any of the deputies' pre-shooting conduct was negligent. The focus of the inquiry, therefore, is whether Deputy Hall's actions during the shooting incident were objectively reasonable under a totality of the circumstances. The Court applies the factors articulated in *Graham* and its progeny.

### A. Severity of Crime at Issue

Mr. Donaldson's arrest warrant was for an illegal drug trafficking offense. Deputies Hall and Grattan had no information of any violent history or weapons owned by Mr. Donaldson. The underlying crime was not violent like a murder or assault charge, which weighs in favor of unreasonable conduct.

However, Mr. Donaldson's conduct during the arrest likely constituted additional crimes that bear on the *Graham* analysis. For example, Mr. Fonzi opined that Mr. Donaldson's conduct constituted assault with a deadly weapon. Such a crime is cognizable in California. *See* Cal. Penal Code § 245(a)(1); *People v. Russell*, 129 Cal. App. 4th 776, 782 (Ct. App. 2005) ("The law makes clear a person who operates or drives a vehicle in an attempt to injure another person has committed assault with a deadly weapon, to wit, the car." (citation omitted)). Thus, Mr. Donaldson's conduct during the incident resulted in severe crimes and the Court finds this factor supports a reasonableness conclusion.

### B. Whether Suspect Posed Immediate Threat to Officers

The second *Graham* factor is the "most important single element" in the analysis. *See Smith*, 394 F.3d at 702 (quoting *Chew*, 27 F.3d at 1441). It is undisputed that Mr.

Donaldson rammed his vehicle into the deputies' vehicles three times each for a total of six times during the course of the shooting incident. Deputy Hall testified that Mr. Donaldson's repeated ramming of his vehicle into Deputy Hall's vehicle along with the fact that Deputy Hall could not see his partner caused Deputy Hall to believe Mr. Donaldson was an immediate threat to both his life and Deputy Grattan's life. At trial, Deputy Hall apportioned his judgment to use deadly force as roughly eighty percent fear for his partner's life and twenty percent fear for his own. In considering this factor, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors that justify such a concern." *Deorle*, 272 F.3d at 1281. In addition, the Court may "only consider the circumstances of which [the deputies] were aware when they employed deadly force." *Hayes*, 746 F.3d at 1232–33 (citing Graham, 490 U.S. at 395; and *Glenn v. Washington Cnty.*, 673 F.3d 864, 873 n.8 (9th Cir. 2011) ("*Graham* teaches that "[w]e cannot consider evidence of which the officers were unaware." (alteration in original))).

*1. Whether Objective Factors Supported Deputy Hall's Fear for Safety of Deputy Grattan and Himself*

Here, there were objective factors that support Deputy Hall's fear. First and most important, Mr. Donaldson's vehicle repeatedly impacted Deputy Hall's vehicle. Instead of complying with police commands, Mr. Donaldson repeatedly rammed his SUV into both deputies' vehicles. The force and impact of Mr. Donaldson's vehicle is evident from the following facts: (1) there was damage to Deputy Hall's front bumper and his license plate was detached; (2) there was damage to and paint transfer visible on Mr. Donaldson's front and rear bumpers; (3) after Mr. Donaldson was shot in the head and likely disabled, his vehicle was traveling at such a speed to knock a parked car across the street 90 degrees from the car's starting position; (4) Deputy Hall had to chase after his vehicle because Mr.

Donaldson's vehicle struck it with enough force to cause it to move backwards;[6] and (5) Deputy Hall's vehicle came to rest several feet to the rear of where the Deputies initiated the vehicle pin. At trial, both deputies testified to the force and speed that Mr. Donaldson's vehicle was striking their vehicles.[7]

Second, both deputies were in close proximity to Mr. Donaldson's moving vehicle. The deputies initiated the vehicle pin by bringing their respective vehicles into contact with Mr. Donaldson's front and rear bumpers. Each deputy exited his respective vehicle in and around the time Mr. Donaldson began ramming his vehicle into the deputies' vehicles. Thus, each deputy was within a few feet—generally, the distance from their driver's side door to the front bumper of their vehicles—of Mr. Donaldson's vehicle. This fact supports Defendant's contention that Mr. Donaldson posed an imminent threat to both deputies.

Third, Deputy Hall claims that he was unable to see Deputy Grattan. Plaintiff argues just the opposite: Deputy Hall should have been able to see Deputy Grattan while Deputy Grattan was in his vehicle and Deputy Hall was outside his vehicle. (*See* Pl. Br. 38–39.) If true, such a fact would cast doubt on Deputy Hall's testimony that he believed Deputy Grattan was pinned between the vehicles. Defendant concedes that had Deputy Hall been able to locate Deputy Grattan he would not have fired his weapon. (Def. Br. 14.) According to Plaintiff's reconstruction of the initial events after the first time Mr. Donaldson rammed his vehicle forward but before the first shots were fired, Deputy Hall would be able to look through Mr. Donaldson's vehicle and see Deputy Grattan's head. Deputy Grattan was "kind of hunched down" in his vehicle and could see over the

---

[6] The crime scene report, photos, and testimony at trial all acknowledge that Deputy Hall's vehicle came to rest several feet south, or behind, where the shooting incident took place. (*See, e.g.*, Ex. 2-020.)

[7] The Court acknowledges the fact that Deputy Grattan's vehicle did not have apparent damage to its front bumper; however, this fact is mitigated because Mr. Donaldson's rear bumper had superficial damage and had the imprint of a license plate. (*Id.*) This suggests that the primary point of contact between Mr. Donaldson's vehicle and Deputy Grattan's vehicle was Deputy Grattan's front license plate. Further, whatever inference the Court might draw from the lack of damage to Deputy Grattan's vehicle is outweighed by the damage to Deputy Hall's vehicle and Mr. Donaldson's vehicle as well as the testimony of the Deputies themselves about the violence of Mr. Donaldson's vehicle.

dashboard of his vehicle. Deputy Grattan remained in that position until Deputy Hall fired his first shot. From these facts, Plaintiff would infer that Deputy Hall should have seen Deputy Grattan because Deputy Grattan would have been clearly visible through the windshield of Mr. Donaldson's vehicle.

However, the Court made a finding of fact that Deputy Hall's testimony was credible when he said he could not see his partner while Mr. Donaldson rammed their respective vehicles, *see supra* section Findings of Fact III.C. The Court reiterates the most critical facts: Mr. Donaldson's rear windows were tinted and the deputies were dealing with a dynamic situation. The foregoing three facts support Deputy Hall's conclusion that Mr. Donaldson and his vehicle posed an immediate threat to both him and his partner. Thus, the Court credits the deputies' testimony and does not accept Plaintiff's theory.

### 2. *Whether Deputy Hall Could Have Verified Deputy Grattan's Location Before Firing*

The Court next addresses whether Deputy Hall could or should have seen or verified Deputy Grattan's position before firing. Deputy Hall asserted that he did not have time to reposition himself to see if Deputy Grattan was pinned behind Mr. Donaldson's vehicle. Assuming, arguendo, that Deputy Hall *could* easily reposition himself and see Deputy Grattan, this theory would undercut his argument that he feared for the life of his partner. Indeed, Plaintiff takes up this possibility and argues that Deputy Hall negligently failed to determine whether Deputy Grattan was, or was not, pinned behind Mr. Donaldson's vehicle during the shooting incident. (*See* Pl. Br. 25.) Plaintiff points to the following facts: after his first attempt, Deputy Hall made no further attempts to determine if his partner was in danger; Deputy Hall did not hear any audible distress from Deputy Grattan; and Deputy Hall did hear sounds consistent with "metal hitting metal." Finally, Plaintiff hypothesizes that once Deputy Hall made the decision to use deadly force he had time to reposition himself and reengage Mr. Donaldson, but did not look for Deputy Grattan when he repositioned himself. (*Id.* at 26.) According to Plaintiff, if Deputy Hall had time to step to the passenger window then he also had time to check the rear of Mr. Donaldson's vehicle.

The expert witnesses both opined whether Deputy Hall should have verified the location of his partner before using deadly force. Mr. Clark opined that Deputy Hall simply could have looked to see if his partner was trapped between Mr. Donaldson's vehicle and Deputy Grattan's own vehicle. Mr. Clark went on to opine that even if Deputy Hall could not see Deputy Grattan due to Mr. Donaldson's tinted windows, Deputy Hall's actions were unreasonable because he could have repositioned himself several feet towards the rear of Mr. Donaldson's vehicle and verified the location of his partner.

Mr. Fonzi testified that it if Deputy Hall evaluated the situation and believed that Deputy Grattan was in imminent danger then he is authorized to use deadly force. He also opined that verification of the location of his partner is not required by police training or guidelines, he had not heard of that term, and it did not exist in any law enforcement guidelines. Mr. Fonzi opined that it is impossible to divorce Deputy Hall's actions from the rapidly evolving, dynamic situation playing out in front of him.

Mr. Clark's opined that Deputy Hall should have repositioned himself to verify the location of his partner, but Mr. Clark does not explain the practicality of doing so while Mr. Donaldson rammed his vehicle into the deputies' vehicles. At the time Deputy Hall made the decision to use deadly force, he did not know where his partner was, he thought his partner was injured or worse, and Mr. Donaldson continued to ram his vehicle back and forth. Because Mr. Clark does not account for the actions of Mr. Donaldson or the dynamic nature of the situation, his opinion constitutes the sort of 20/20 hindsight the Supreme Court cautioned against in *Graham*, *see* 490 U.S. at 396.

Mr. Fonzi testified that there is no requirement to verify the location of one's partner in any training that he was involved in or based on law or police guidelines. Instead, law enforcement officers are trained to protect themselves and others based on the circumstances unfolding in front of them and based on an officer's threat assessment. Mr. Fonzi testified that the 1999 Columbine shooting changed the way in which police officers were trained to respond to imminent threats of death or serious injury. Before the Columbine shooting, officers were trained to surround and contain; now officers are taught

to "get out in front" of the threat. (Trial Transcript 261:25.) Taking into account the changes in law enforcement training and applying them to the facts of the case, Mr. Fonzi opined that if Deputy Hall reasonably feared for his partner's life it would not be reasonable for him to verify his partner's location.

The Court finds Mr. Fonzi's opinion persuasive. Between the two experts, Mr. Fonzi's experience is more current than Mr. Clark's and Mr. Fonzi's experience incorporates the changes in police doctrine and training that occurred after the 1999 Columbine shooting. Unlike Mr. Clark, Mr. Fonzi is familiar with law enforcement training and standards because he served in a law enforcement capacity until 2014. Therefore, Mr. Fonzi's opinion on the verification issue is predicated on the most recent training techniques. Further, Mr. Fonzi's opinion—that a law enforcement officer is not mandated to verify his partner's location if he has a reasonable fear—is more credible than Mr. Clark's opinion that Deputy Hall should have verified his partner's location. This is because Mr. Fonzi's opinion accounts for an officer's threat assessment of a rapidly evolving situation while Mr. Clark's opinion injects a requirement that an officer disengage from the threat in front of him, search for his partner, and then re-engage the threat posed by the suspect from a disadvantageous position. Therefore, the Court credits Mr. Fonzi's testimony and finds that Deputy Hall did not act unreasonably by not verifying Deputy Grattan's location before engaging his target.

### 3. Whether Mr. Donaldson's Vehicle Was a Deadly Weapon

Next, Plaintiff contends that Mr. Donaldson's vehicle did not subject Deputy Hall to an immediate threat of death or serious bodily injury because he was not in the path of the vehicle. (Pl. Br. 22.) Mr. Clark opined that Mr. Donaldson's actions in his vehicle merely amounted to property damage to the other vehicles—not an assault on Deputy Hall. Opposing this view, Mr. Fonzi opined that Mr. Donaldson's use of his vehicle would be characterized as an assault with deadly weapon in a law enforcement officer's threat assessment. (Def. Br. 8.)

The Court agrees with Mr. Fonzi's opinion. Deputy Hall exited his vehicle after Mr. Donaldson's initial collision. He stood on the curb by the driver's side, front quarter panel of his vehicle. Thus, Deputy Hall was within a few feet of Mr. Donaldson's vehicle as it was striking his vehicle with enough force to eventually cause Deputy Hall's vehicle to roll well to the rear of its initial starting position. The issue here is one of degree: had Deputies Hall and Grattan both been in their respective vehicles and both known the other was safely in the vehicle then the analysis here would be different. Instead, Deputy Hall testified that he feared for his partner's life and did not know where he was. Further, he was within a few feet of a sports utility vehicle that was moving back and forth between the deputies' vehicles.

The objective facts support the conclusion that Mr. Donaldson's vehicle was a deadly weapon. The Court previously discussed the damage to the vehicles in its finding of fact. *See supra* section Findings of Fact III.C. The Court briefly recounts relevant facts here: (1) Deputy Hall's vehicle had visible damage and paint transfer and the license place was knocked off during the incident; (2) Deputy Hall's vehicle rolled backwards from its initial position; (3) Mr. Donaldson's rear bumper had damage consistent with a license plate; and (4) Mr. Donaldson's vehicle caused a Mitsubishi Lancer to turn ninety degrees as Mr. Donaldson's vehicle traveled from the vehicle pin into the yard across the street. These objective facts support a conclusion that Mr. Donaldson drove his vehicle with sufficient speed to cause damage to and move other vehicles. While Deputy Grattan's vehicle had no visible damage, the totality of the circumstances point to the conclusion that the vehicle was a deadly weapon. If a human was within range of a vehicle moving at such a speed it would be reasonable to conclude that that human would be harmed and possibly killed. Therefore, the Court finds that Deputies Hall and Grattan could have reasonably believed Mr. Donaldson's vehicle was a deadly weapon.

/ / /

/ / /

15-CV-908 JLS (KSC)

***C. Whether the Suspect Was Actively Resisting Arrest or Attempting to Evade Arrest by Flight***

In determining whether a suspect was actively resisting arrest, district courts in the Ninth Circuit draw a distinction between passive and active resistance. *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (citing, e.g., *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994)). "'Resistance,' however, should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Id.* Courts must "evaluate the nature of any resistance in light of the actual facts of the case." *Id.* Examples of passive noncompliance include an arrestee physically impeding an officer's search of his pockets and not attempting to flee, *see Davis*, 478 F.3d at 1056, and an arrestee refusing to remove his hands from his pajamas and reentered his home despite police orders to the contrary and did not attack the officers, *see Smith*, 394 F.3d at 703. A final example was when a suspect did not remain in his car, began shouting gibberish, and hit himself in the quadriceps, *see Bryan*, 630 F.3d at 830.

At trial, Mr. Fonzi discussed at length the difference between passive and active resistance. (*See* Trial Transcript 258:6–259:5.) He described passive resistance as a person not being compliant, but "there's no action towards the officer." (*Id.* at 258:16–17.) He described active resistance as several levels on the spectrum of resistance: at the lower level a suspect could be "actively engaged in doing something, pushing, pulling, running from an officer, preventing him from controlling or effecting an arrest." (*Id.* at 258:17–20.) The next level is where "an individual is using hands, feet, weapon, or an instrument to assault a police officer." (*Id.* at 258:21–23.) The highest level is life-threatening. There, a suspect's actions could cause serious injury or death to an officer or another person.

The facts here are distinguishable from passive noncompliance cases. Before attempting the arrest, Deputies Hall and Grattan did not have any information that Mr. Donaldson was violent. The arrest warrant was not for a violent felony. The deputies

pinned Mr. Donaldson's vehicle so that he could not escape. Both deputies' vehicles, though unmarked, had flashing red and blue lights consistent with commonly known police warning signals. At this point in time, the situation changed. Before the deputies were able to issue any commands to Mr. Donaldson, he shifted his vehicle into drive and drove his vehicle into Deputy Hall's vehicle. He continued to ram his vehicle back and forth for a total of six total contacts, three times into Deputy Hall's vehicle and three times into Deputy Grattan's vehicle. Mr. Donaldson's vehicle was driving at sufficient speed to cause damage to Deputy Hall's front bumper, cause Deputy Hall's license plate to detach, and cause Deputy Hall's vehicle to roll backwards. Mr. Donaldson's rear bumper had paint transfer and an imprint from Deputy Grattan's license plate.

This is not a situation where Mr. Donaldson was actually detained and could not harm or evade the deputies. The facts here are exemplary of active resistance. Indeed, the facts fit in the highest level of active resistance—life threatening—articulated by Mr. Fonzi. This factor weighs in favor of finding Deputy Hall's use of force was objectively reasonable.

### D. Quantum of Force Used

Assessing the quantum of force used against Mr. Donaldson requires the Court to consider the "type and amount of force inflicted." *Deorle*, 272 F.3d at 1279 (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000), *vacated and remanded on other grounds sub nom. Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001)). The *Graham* factors "bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure." *Chew*, 27 F.3d at 1441.

Here, the Deputies used the most severe force available to them: their Glock service weapons. However, the Court does not consider this fact in a vacuum. Mr. Donaldson's vehicle was a deadly weapon and created a plausible risk of death or severe bodily harm for Deputy Hall, both to himself and to Deputy Grattan. Thus, the quantum of force used

was equal to the threat posed. The Court finds this factor weighs in favor of reasonable use of force.

### E. Availability of Less Severe Alternatives

Plaintiff argues that Deputy Hall disregarded training that stresses the use of alternative measures to effectuate the arrest of noncompliant suspects. (Pl. Br. 28.) Plaintiff lists the following U.S. Marshal Service policies relevant to this situation: (1) law enforcement officers are trained that deadly force is a last resort; (2) deputy U.S. marshals are trained to employ alternative methods and tactics when deadly force is not authorized; (3) when confronted with a fleeing suspect in a motor vehicle it is better to get out of the way of the vehicle if possible; (4) law enforcement officers are trained that shooting into a moving vehicle is not an effective means of stopping the vehicle; and (5) law enforcement officers are taught to avoid so called crossfire situations where their rounds may hit a fellow law enforcement officer or civilians. (*See* Pl. Br. 28–33.) These arguments all implicate the same issue: was a less severe alternative available to the deputies.

#### 1. Deadly Force as Last Resort

Plaintiff states Mr. Fonzi agreed at trial that the use of deadly force is always a last resort. (Pl. Br. 28.) The Court agrees with that general statement, but Deputy Hall stated that he feared for the safety of his partner and himself. In such a circumstance, the use of deadly force could be warranted. *See* Cal. Penal Code § 835a. Plaintiff's argument here does not speak to the issue of whether Deputy Hall's actions were objectively reasonable in these circumstances.

#### 2. Alternative Methods and Tactics

Plaintiff argues that deputy U.S. marshals are trained to employ alternative methods and tactics when deadly force is not authorized. (*Id.* at 29.) Specifically, Deputy Hall placed a GPS tracker on Mr. Donaldson's car that would have allowed the deputies to track Mr. Donaldson's vehicle "if it drove away." (*Id.*) Again, the Court agrees with the general principle that the deputies could have tracked Mr. Donaldson's vehicle if it drove away. But, the issue here is that Mr. Donaldson did not drive away; he repeatedly rammed his

vehicle into the deputies' vehicles while the deputies were in close proximity to that moving vehicle.

Additionally, Plaintiff points to Deputy Grattan's testimony that deadly force would not be authorized against Mr. Donaldson simply because he was ramming his vehicle back and forth unless Mr. Donaldson posed an imminent threat of death or serious bodily injury to either deputy. (*Id.*) At trial, Plaintiff's counsel posed a hypothetical to Deputy Grattan that he assume that (1) neither deputy's life was in danger; and (2) Mr. Donaldson was ramming to escape the vehicle pin. (Trial Transcript 34:12–21.) Deputy Grattan agreed with that hypothetical; as did Deputy Hall when posed a similar hypothetical. The obvious defect of that hypothetical is Deputy Hall testified that he feared that Deputy Grattan was pinned behind Mr. Donaldson's vehicle and he could not see Deputy Grattan from his position. Deputy Hall believed Deputy Grattan's life was in danger; the hypothetical fails to address this critical fact and does not modify this Court's conclusions.

### 3. Deputies Should Have Moved Out of the Path of the Vehicle

Plaintiff argues that both deputies and both experts agreed that it is better to get out of the way of a moving vehicle, if possible, rather than using deadly force. (Pl. Br. 31.) According to Plaintiff, Mr. Fonzi agreed that police officers will generally be taught that if the circumstances permit, moving out of the way of a moving motor vehicle is a preferred tactical alternative to the use of deadly force. (*Id.* at 32 (citing Trial Transcript 283:19–284:2).) Plaintiff omits a relevant qualification to Mr. Fonzi's statement. Mr. Fonzi was asked if he agreed that officers "will generally always be taught that if you can move out of the way of a vehicle, it is better to move out of the way than to shoot into the vehicle." (Trial Transcript 283:23–25.) He answered, "In the reasonable and appropriate circumstances, yes, I agree." (*Id.* at 284:1–2.) Plaintiff's citations to the transcript and arguments include relevant qualifications: (1) it is better to get out of the way, *if possible*; (2) if you *can* move out of the way, it is *better* to move out of the way; and (3) in *reasonable and appropriate circumstances*. The statements reflect the generalized training principle that it is better to move out of the way, but they do not account for the situation, like here,

where an officer is presented with an imminent threat and cannot remove himself from a situation without putting his partner's life at further risk.

### 4. *Shooting a Vehicle Not an Effective Means to Stop a Vehicle*

Next, Plaintiff argues that Deputy Grattan acknowledged that United States Marshal training specifically instructs deputies that use of deadly force against the driver of a motor vehicle is an ineffective means of stopping that vehicle. (Pl. Br. 32.) Both experts agreed to this statement and Mr. Fonzi, specifically, agreed that disabling or incapacitating a driver of a moving vehicle will not always stop a vehicle because the vehicle can keep going if the driver is unconscious or dead. (*Id.* (citing Trial Transcript 283:12–18).)

United States Marshal Service's Policy Directive 14.15 outlines the use of force requirements for deputy United States marshals. It provides, in part, "[d]eadly force may not be used solely to prevent the escape of a fleeing suspect . . . . A [deputy marshal] may use deadly force against a fleeing suspect . . . only when the [deputy marshal] has a reasonable belief that the suspect . . . poses an imminent danger of death or serious physical injury to the [deputy marshal] or to another person." (Ex. 21-002.) It goes on to state "[f]irearms may not be fired solely to disable moving vehicles." (*Id.*)

Plaintiff's argument here has some merit. Both experts agreed that shooting a driver of a moving vehicle is not always an effective means to stop the vehicle because, like here, disabling or incapacitating a driver will not always stop the movement of the vehicle. Indeed, after he was hit by Deputy Hall's rounds, Mr. Donaldson's vehicle turned out of the vehicle pin, hit a parked car with enough force to cause it to turn ninety degrees, and crashed into a house across the street. Mr. Clark opined that "you're never going to stop the momentum of a moving vehicle with a bullet, and the outcome is frequently very dangerous because it puts the vehicle out of control." (Trial Transcript 195:12–14.) Mr. Fonzi opined that officers are "not going to stop a vehicle, but there are those situations where it may be reasonable, and that's what we evaluate." (*Id.* at 283:4–6.) The experts agree that firing into a vehicle is not the best course of action, but diverge on whether it is

15-CV-908 JLS (KSC)

ever appropriate.  The Court examines similar situations before other courts to determine whether Deputy Hall's conduct was reasonable.

In *Brosseau v. Haugen*, 543 U.S. 194 (2004), the Supreme Court examined, in a qualified immunity context, whether a plaintiff had a clearly established Fourth Amendment when an officer shot a fleeing suspect who presented a risk to others.  There, a law enforcement officer was searching for a suspect in the neighborhood around the suspect's mother's house.  *Id.* at 196.  The suspect ran and "jumped into the driver's side of [his] Jeep."  *Id.*  The officer "arrived at the Jeep, pointed her gun at the suspect, and ordered him to get out of the vehicle."  Instead of complying, the suspect attempted to start the Jeep and the officer began to hit the driver's side window with the butt of her handgun until the window shattered.  *Id.*  The officer hit the suspect on his head and tried to grab the keys, but the suspect was able to start the Jeep.  *Id.*  "As the Jeep started or shortly after it began to move, [the officer] jumped back and to the left.  She fired one shot through the rear driver's side window at a forward angle, hitting [the suspect] in the back."  *Id.* at 196–97.

Though the Supreme Court was analyzing a qualified immunity issue, the predicate question was whether the officer's conduct violated the suspect's Fourth Amendment right.  *See id.* at 197.  Therefore, the Supreme Court's analysis is a helpful starting point to evaluate the case at bar.  The Court characterized the situation the officer confronted as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from the flight."  *Id.* at 200.  The Court examined three appellate cases where officers used force when a vehicle posed an imminent threat of serious physical harm to others.  *See id.* at 200–01 (citing *Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993); and *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992); and *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993)).  The appellate cases "show that this area is one in which the result depends very much on the facts of each case" and the Supreme Court concluded that the officer's actions "fell in the 'hazy border between excessive and acceptable force.'"  *Id.* at 201 (quoting *Saucier v. Katz*, 533 U.S. 192, 206 (2001)).  The

Court held that the officer's actions did not violate a clearly established constitutional right. This helps establish the outer bounds of appropriate conduct when an officer fires into a moving vehicle.

Here, like *Brosseau*, the facts involve a law enforcement officer's decision to fire into a vehicle that posed a threat to others in the immediate vicinity of that vehicle. In *Brosseau*, the officer's actions fell in the "hazy border between excessive and acceptable force" because the Jeep was beginning to drive away from the officer—the threat was receding. Here, Mr. Donaldson did not drive away from the deputies but rather continually rammed his vehicle back and forth between the deputies' vehicles. Thus, Mr. Donaldson's actions place this case closer to acceptable force rather than excessive force. The threat from Mr. Donaldson remained throughout the situation presented to Deputy Hall.

Courts have found the use of deadly force reasonable in other situations where an officer fires at a suspect's vehicle moving in close proximity to a fellow officer in a vulnerable position. *Rico v. Cnty. of San Diego*, No. 9cv2684 BTM (WVG), 2013 WL 3149480, at *8 (S.D. Cal. June 18, 2018). Thus, in *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), an officer was "standing in a slippery yard with a minivan accelerating around him" and the suspect had "failed to yield to police sirens as well as to direct commands to put his hands up and to stop the vehicle." *Id.* at 551. While the minivan was accelerating around the officer, his partner was "nearby either lying fallen on the ground or standing but disoriented." *Id.* The Ninth Circuit concluded that in "this 'tense, uncertain, and rapidly evolving' situation, a reasonable officer had probable cause to believe that the threat to safety justified the use of deadly force." *Id.*

Other courts have arrived at similar conclusions. *See Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007) (holding use of deadly force to be reasonable where two officers pointed their weapons at suspect in vehicle, suspect accelerated in vehicle, knocking down one officer who had been holding onto suspect's vehicle, and his partner fired into the vehicle as it continued to accelerate away). In *McCullough v. Antolini*, 559 F.3d 1201, 1203 (11th Cir. 2009), two officers attempted to

pin a suspect's truck with their police cruisers. The truck escaped before the pin was executed, but the officers cornered the truck in a parking lot. One officer's vehicle was inches away from suspect's truck and the officers heard truck's engine revving and tires spinning. *See id.* The suspect did not comply with the officers' commands and the officers opened fire on the truck as it continued to "mov[e] out of the boxed-in situation that the officers had him in." *Id.* (alteration in original) (footnote omitted). The officers continued to fire even though one officer testified that he did not know where his partner was and yelled at his partner to "watch your crossfire." *Id.* at 1204. The Eleventh Circuit found the officers' use of force reasonable. *Id.* at 1208 ("In short, the sheriff's deputies used deadly force in a split-second situation where a suspect late at night refused to pull over, engaged in a high-speed chase, and then, after pulling over, repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward the deputy standing nearby in a parking lot.").

In *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1164 (11th Cir. 2005), a SWAT team surrounded a parked Oldsmobile and yelled at the suspect and his passengers to open the doors and surrender. "The Oldsmobile then began to move, with [the suspect] as the driver, revving the engine loudly and the car jerking backwards and forwards." *Id.* The Oldsmobile made a hard turn towards the road and one of the officers "saw the car coming directly at him and believed it would run right through him in order to leave the scene" and fired on the Oldsmobile. *Id.* The Eleventh Circuit affirmed the district court's determination that the officer's actions were reasonable and noted, in particular, that "[e]ven if in hindsight the facts show that the SWAT Team could have escaped unharmed, a reasonable officer could have perceived that [the suspect] posed a threat of serious physical harm." *Id.* at 1168; *see also Levesque v. City of Mesa*, 444 Fed. App'x 978, 979 (9th Cir. 2011) (concluding district court did not err in finding of objective reasonableness where the suspect "accelerated his truck in the general direction of the two officers while both officers were on foot" and reasoning that "[g]iven the officers' close proximity to the

moving vehicle, it was objectively reasonable for the officers to shoot [the plaintiff] because the moving vehicle posed an immediate threat to the officers' safety.").

The foregoing cases illustrate that the outcome of Fourth Amendment objective reasonableness cases "depend[] very much on the facts of each case." *Brosseau*, 543 U.S. at 201. If any common thread can be unwound from the cited cases it is that numerous courts have found officer's actions to be reasonable when firing into moving vehicles, including vehicles moving away from the officers, as long as there was an imminent threat of death or serious bodily injury to the officer or others. At the very least, other courts have determined it is reasonable to fire upon the driver of a moving vehicle, assuming an imminent threat was present. Thus, the Court finds reasonable Deputy Hall's decision to fire into a moving vehicle that was not moving away and he perceived as an imminent threat to himself and Deputy Grattan.

### 5. *Law Enforcement Officers Are Trained to Avoid "Crossfire" Situations*

Finally, Plaintiff argues that law enforcement officers are trained to avoid exposing fellow officers to the risk of death or serious bodily injury by positioning themselves to avoid crossfire situations when using deadly force. (Pl. Br. 33.) Mr. Clark opined that officers are "required to be aware of where your bullet is going to go when you pull the trigger, and you will never shoot in the direction of your partner or an innocent civilian." (*Id.* (quoting Trial Transcript 196:20–197:30).) Plaintiff contends that Mr. Fonzi generally agreed law enforcement officers are specifically trained to avoid placing themselves in situations in which they may shoot another officer when employing deadly force. (*Id.* (citing Trial Transcript 246:3–23, 276:17–277:3, 297:10–20).) Mr. Fonzi also conceded that Deputy Grattan was in fact in Deputy Hall's line of fire. (*See id.* at 33–34.)

Defendant contends that Mr. Fonzi opined that law enforcement officers are trained to consider the risks of crossfire in determining whether to use deadly force, "but are not precluded from doing so simply because the risk exists." (Def. Br. 8 (citing Trial Transcript 270–72).)

The Court begins here by noting that the experts' ultimate conclusions are directly in conflict on the issue of crossfire, but agree to some extent. Mr. Clark opined that officers are trained to "never shoot in the direction of your partner or an innocent civilian." (Trial Transcript 197:2–3.) Mr. Clark explained the reasoning behind this training was derived from tragic historical episodes where officers shoot their own partners. (*Id.* at 197:5–9.) On the other hand, Mr. Fonzi testified that officers are trained to take crossfire into consideration, but crossfire does not mean that officers "don't engage or . . . abandon your obligation, duty, or how you're trained to defend another officer or yourself." (*Id.* at 271:17–19.) On cross examination, Mr. Fonzi did agree that law enforcement officer training specifically states that officers should avoid crossfire situations when confronting suspects. (*Id.* at 297:17–20.)

The Court finds Mr. Fonzi's testimony more persuasive than Mr. Clark's testimony. Both experts agree that law enforcement officer's training stresses the importance of avoiding crossfire situations. The experts depart on whether this training precludes an officer engaging a suspect because an officer or civilian may or, as here, actually was in the field of fire. Mr. Clark's testimony is not as credible as Mr. Fonzi's testimony because Mr. Clark's opinion would effectively prohibit law enforcement officers from engaging a suspect if a fellow officer or civilian may be in the line of fire no matter the surrounding circumstances. Mr. Fonzi accounts for extenuating circumstances by stating that officers consider crossfire but are not precluded from taking any action whatsoever.

In sum, the Court finds that none of Plaintiff's arguments that the deputies should have used an alternative to use of force are persuasive. As previously discussed, Mr. Donaldson presented the deputies with an imminent threat; the threat did not diminish during the course of the incident. The Court finds that the deputies did not have the opportunity to use alternatives to the use of deadly force.

### F. Suspect's Mental and Emotional State

Neither side presented information concerning Mr. Donaldson's mental or emotional state. The deputies had no information concerning Mr. Donaldson's state of mind before

42

attempting the arrest and they had no verbal exchange with Mr. Donaldson during the incident other than issuing commands to Mr. Donaldson to stop what he was doing. Therefore, the Court finds this factor does not impact the reasonableness analysis.

### G. Warnings to Suspect

District courts in the Ninth Circuit also consider whether police officers provided warnings before using force. *See Bryan*, 630 F.3d at 831 (citing *Deorle*, 272 F.3d at 1284). Warnings should be given, when feasible, if the use of force may result in serious injury; generally, courts consider this in the context of less than lethal force, *see Deorle*, 272 F.3d at 1284, but have also considered warnings in the context of lethal force, *see Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1119 (9th Cir. 2005) (stating the suspect was "armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands by raising the sword and grunting, refused to let go of the sword," which resulted in deputies firing on suspect).

Here, Deputy Hall yelled the following series of commands at Mr. Donaldson three times: "Police. Don't move. Let me see your hands." (Trial Transcript 159:1–2.) Deputy Hall gave those commands after Mr. Donaldson rammed his vehicle into Deputy Hall's vehicle. Thus, Mr. Donaldson had already begun using his vehicle as a deadly weapon when Deputy Hall issued his warnings. Given that Mr. Donaldson had already manifested his intent not to comply, the Court finds that Deputy Hall's warnings were sufficient in this case.

### H. Plaintiff's Battery Claim

Plaintiff advances two arguments why Deputy Hall's actions constituted battery. First, Deputy Hall used excessive force during the shooting incident. Second, Deputy Hall's "self-defense" justification is not credible. (*See* Pl. Br. 34–35.) The Court considers each in turn.

#### 1. Whether Deputy Hall Used Excessive Force

Plaintiff argues that Deputy Hall "affirmed his homicidal intent in using deadly force, stating that this direct intention was 'to kill Mr. Donaldson' during the time in which

he fired his five shots." (*Id.* at 34 (citing Trial Transcript 124:11–15, 125:14–17).) Plaintiff points to several facts supporting her contention that Deputy Hall clearly intended to kill Mr. Donaldson. These facts include: (1) Deputy Hall opened fire into the windshield to strike Mr. Donaldson; (2) he kept firing because he had not yet struck Mr. Donaldson; (3) he believed that his fourth round struck Mr. Donaldson in the head but fired one additional round; and (5) did not deviate from his intent to strike Mr. Donaldson by, for example, looking for his partner. (*See id.* at 34–35.) Plaintiff also argues that lethal force from Deputy Hall's service weapon is entirely inappropriate tool for stopping a motor vehicle and that Deputy Hall repositioned himself closer to Mr. Donaldson's vehicle to afford a more direct line of fire at Mr. Donaldson. (*Id.* at 35.) Plaintiff sums up her argument as "Deputy Hall's priority was killing Mr. Donaldson." (*Id.*)

Defendant argues that the relevant excessive force inquiry is "whether a reasonable officer, standing in Deputy Hall's shoes, would believe Deputy Grattan was in danger of death or grievous bodily harm." (Def. Br. 14.) Looking at the totality of the circumstances, Deputy Hall reasonably believed that Deputy Grattan was in danger because he could not see through Mr. Donaldson's tinted rear windows and Deputy Grattan was not where Deputy Hall expected him to be. (*See id.*) "Had Deputy Hall been able to locate Deputy Grattan, he would not have fired his weapon." (*Id.*)

The Court agrees with Defendant. At trial, Deputy Hall testified that he fired with the intent to kill Mr. Donaldson. But, California law allows police officers, like Deputy Hall, to use reasonable force, including lethal force "to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance." Cal. Pen. Code § 835a. It is not enough that Deputy Hall intended to kill Mr. Donaldson, Plaintiff must also prove unreasonable force was used. *Edson*, 63 Cal. App. 4th at 1273. Moreover, the Court uses the same objective reasonableness standard, in analyzing excessive force as it used in Fourth Amendment claims. *See Hayes*, 736 F.3d at 1232 (citing, e.g., *In re Joseph F.*, 85 Cal. App. 4th at 989).

44

Plaintiff's excessive force argument here does not cover any new ground. Plaintiff demonstrates that Deputy Hall intended to use lethal force against Mr. Donaldson.[8] Yet, Plaintiff does not place that conclusion in the broader context of the Deputy Hall's fear for his partner's life and for his own life at the time he decided to use lethal force. As Defendant argues, the proper analysis is whether Deputy Hall reasonably believed that Deputy Grattan was in danger of death or grievous bodily harm. The Court finds that its objective reasonableness analysis, using the *Graham* factors and its progeny, applies with equal weight here. *See supra* sections Conclusions of Law II.A–G. Plaintiff's argument does not alter that outcome—Deputy Hall's use of force was objectively reasonable.

### 2. *Whether Deputy Hall's Self-Defense Justification Is Not Credible*

Next, Plaintiff argues that Deputy Hall's self-defense justification is not credible. (Pl. Br. 35.) At trial, Deputy Hall testified that approximately twenty percent of his motivation to fire was in self-defense. Deputy Hall's fear for his own safety was predicated, in part, on the direction of Mr. Donaldson's front tires. Deputy Hall testified that the wheels of Mr. Donaldson's vehicle were completely canted to the left such that the vehicle could have "popped over the curb" and "swung towards him." (*Id.* (citing Trial Transcript 120:18–121:5).) Yet, the forensic animation depicts wheels canted to the right, which contradicts Deputy Hall's testimony. Further, if the wheels were canted to the right then such an alignment would, according to Plaintiff, carry Mr. Donaldson's vehicle away from Deputy Hall's position, not towards his position. If true, this would contradict Deputy Hall's fear for his own safety.

Plaintiff also points to Mr. Fonzi's testimony as undermining Deputy Hall's concern for his personal safety. (*Id.* at 35–36 (citing Trial Transcript 303:14–18).) Mr. Fonzi testified that, based on his understanding of the facts of the case, Deputy Hall did not fire

---

[8] Plaintiff also argues that Deputy Hall's use of force was an entirely inappropriate tool for stopping Mr. Donaldson's moving vehicle. The Court discussed this argument above, *see supra* section Conclusions of Law, II.E.4. Plaintiff's argument does not go beyond its argument in regards to her negligence claim and the Court finds its prior reasoning is equally applicable here.

in self-defense, but rather in defense of his partner—Deputy Grattan. (Trial Transcript 303:7–10.)

The Court first examines the direction of the wheels argument. Plaintiff points to Deputy Hall's testimony where he stated that when he was on the curb he specifically saw Mr. Donaldson's front wheels and the wheels were "completely canted to the driver's left." (*Id.* at 121:1–2.) Deputy Hall testified that he feared that if Mr. Donaldson reversed his vehicle and popped over the curb, then the front of the vehicle would have swung towards him. (*Id.* at 121:2–5.) Plaintiff then points to Deputy Hall's later testimony where he was asked about the forensic animation depicting his perspective, (*see* Ex. 11), and the forensic animation showed that the wheels of Mr. Donaldson's vehicle were canted to the right, not the left. (Pl. Br. 36 (citing Trial Transcript 121:22–122:6).) Plaintiff concludes by quoting Deputy Hall's explanation for the discrepancy between his prior testimony and the forensic animation, "This isn't reality. This is a depiction." (*Id.* at 37 (quoting Trial Transcript 123:12–18).) Based on this discrepancy alone, Plaintiff would have the Court discount Deputy Hall's self-defense theory.

As an initial matter, the Court notes that the burden is not on Defendant to prove unreasonable force as an affirmative defense nor must Defendant prove self-defense. The burden is on Plaintiff to prove unreasonable force. *See Edson*, 63 Cal. App. 4th at 1273–74. Plaintiff fashions her argument as to undermine a self-defense affirmative defense. This effort is misplaced. Plaintiff must show that Deputy Hall's actions were objectively unreasonable.

The Court will consider Plaintiff's argument, however, in the context of the totality of the circumstances to determine whether Deputy Hall's actions were objectively reasonable. Plaintiff's line of argument speaks only to Deputy Hall's self-defense justification and not to his belief that his partner's life was in danger. Even if the Court were to accept Plaintiff's argument in its entirety the argument does not address Deputy Hall's belief that he was acting in defense of his partner. Deputy Hall estimated that roughly twenty percent of his justification for using deadly force was to protect himself

and eighty percent was in defense of his partner. Plaintiff urges the Court to find the forensic animation depicting Deputy Hall's perspective to be more persuasive than Deputy Hall's own testimony about what he saw and what he recalls. Certainly, there appears to be a conflict between those two pieces of evidence: the forensic animation depicts wheels canted to the right; Deputy Hall testified they were canted to the left. The Court finds that this discrepancy is not dispositive in the overall analysis for two reasons.

First, the forensic animation was constructed based on a re-enactment that Deputy Hall admitted he participated in. (Trial Transcript 122:1–15.) Thus, the forensic animation does not come from an independent source, but rather was constructed with Deputy Hall's participation and memory. There is no evidence that Deputy Hall endorsed every minute detail of the forensic animate; indeed, he testified that the animation was not reality. The animation was a depiction. (*Id.* at 123:15.) Plaintiff presents no other objective fact that casts doubt on Deputy Hall's testimony. Essentially, Plaintiff seeks to impeach Deputy Hall's testimony with an animation constructed according to Deputy Hall's input. Without additional objective facts, the Court will not discount Deputy Hall's trial testimony on the basis of the forensic animation. Second, Mr. Fonzi's opinion that it would not be objectively reasonable for Deputy Hall to fire in self-defense—an opinion which appears to bolster Plaintiff's position—is qualified by Mr. Fonzi's statement that his opinion was "[b]ased on the movements of the vehicle in the moving diagram." (*Id.* at 303:17–18.) Thus, Mr. Fonzi's statement, which appears to cast doubt on Deputy Hall's self-defense argument, is itself predicated on the forensic animation.

Even if the Court assumes that the forensic animation was correct, Plaintiff's argument is, at best, inconclusive. Plaintiff would interpret the canting of the wheels as dispositive to the direction the vehicle traveled and Deputy Hall's relative safety on the curb. Yet, this is exactly the sort of 20/20 hindsight courts are instructed not to participate in. Indeed, the canting of the wheels obscures the broader observation that Mr. Donaldson was traveling at speed, in a limited space, and acting unpredictably. The Court will not

infer from the canting of the tires alone, without additional objective facts, that Deputy Hall's justification is unreliable.

Second, even if Deputy Hall's self-defense belief was completely unjustified, Plaintiff does not account for Deputy Hall's justification that he was firing in defense of his partner. Defense of others is a legitimate use of force and itself an independent ground to find Deputy Hall's actions reasonable.

## CONCLUSION

This case is a tragedy in every sense of the word. Plaintiff has lost her husband and the Court is cognizant of the loss in life, which cannot be taken lightly. However, Mr. Donaldson created a deadly situation as soon as he decided not to comply with the deputies' commands. Deputy Hall could not see his partner and feared that he was pinned behind Mr. Donaldson's car. The objective facts support his statement that he could not see his partner. Deputy Hall was authorized to use deadly force in defense of the life of his partner.

Having duly considering the testimony and evidence admitted at trial and the law, the Court **HEREBY FINDS** that Plaintiff has not met her burden of establishing, by a preponderance of the evidence, that Deputy Hall's use of deadly force was objectively unreasonable. As such, the Court **FINDS IN FAVOR OF DEFENDANT**. A proposed judgment consistent with this Order shall be lodged by Defendant <u>on or before seven (7) days from when this Order is electronically docketed</u>.

**IT IS SO ORDERED.**

Dated: February 26, 2018

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

15-CV-908 JLS (KSC)